Alex **QUADRINI**, Petitioner–Appellant,

v.

Donald **CLUSEN**, Superintendent of the State of Wisconsin Green Bay Reformatory, Respondent–Appellee.

No. 87–1733.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1987.

Decided Jan. 11, 1989.

Thomas G. Wilmouth, Gerald P. Boyle, S.C., Milwaukee, Wis., for petitioner-appellant.

William L. Gansner, Asst. Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for respondent-appellee.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

Petitioner Alex Quadrini appeals the district court's denial of his petition for a writ of habeas corpus. Quadrini was convicted before a jury of first-degree murder and sentenced to life imprisonment on October 18, 1980. We affirm.

## I.

On May 18, 1980, John Ristau, the owner of the Glynholm Motel in Kenosha County, Wisconsin, found the body of David Leverett in Room 8 of the motel. Shortly before the discovery of the body the owner received the key to Room 8 from an individual later identified as Alex Quadrini, the petitioner in this case. Ristau contacted the Kenosha County Sheriff's office to report the discovery of the deceased and informed the police later that he and his wife had observed the petitioner entering a taxi after the discovery of Leverett's body. Pursuant to a radio dispatch based upon this information, a City of Kenosha police officer stopped the taxi in which Quadrini was a passenger, arrested him, and transported him to the Kenosha County Sheriff's Department.[1]

1. The record indicates that Quadrini was arrested without a warrant. The legality of the arrest is not at issue in this case because the parties stipulated that there was probable cause to arrest Quadrini. However, we note the circumstances surrounding Quadrini's arrest because they become relevant in the context of petitioner's right to counsel claims discussed *infra*.

At approximately 3:20 p.m. on the same day, Detective Crichton and Deputy Copen of the sheriff's department took Quadrini into an interrogation room. Crichton read Quadrini his constitutional rights[2] and asked him whether he understood. Quadrini stated that he did and that he was willing to talk with the officers at that time. The interrogation lasted approximately 45 minutes, and the officers testified that Quadrini was cooperative and appeared relaxed. At the conclusion of the interrogation, Quadrini made a general exculpatory statement and consented to the search of his flight bag, which was retrieved from the taxicab at the time of his arrest. The bag contained his own belongings as well as those of the deceased. Quadrini identified all of the items in the flight bag.

On the following day, May 19, 1980, the petitioner made his first court appearance where bond was set at $50,000 cash. Later that same day, formal charges were filed charging him with the first-degree murder of David Leverett.[3] The petitioner's initial appearance on the complaint took place the next day on May 20, 1980.[4] The events transpiring between the petitioner's appearance at the bond hearing on May 19 and his initial appearance on May 20, particularly the circumstances surrounding the petitioner's incriminating statements made to the police during the custodial interrogation on May 19, are challenged on appeal.

Following the petitioner's appearance at the bond hearing, Sergeant Duma of the sheriff's department took the petitioner to the juvenile division, another office in the sheriff's department.[5] Detective Norlander was working at his desk in the juvenile division when Duma arrived with Quadrini; he agreed to watch Quadrini while Duma interviewed Quadrini's cell mate. Norlander had Quadrini's dinner brought to him at approximately 6:15 p.m., and did not converse with him until 7 p.m., when Detective Andrekus came into the office. At that time Norlander repeated the *Miranda* warnings to Quadrini, and Quadrini responded that he understood them. Quadrini specifically replied that he did not want an attorney present despite the fact that after his court appearance earlier that day he had been told by an investigator from the public defender's office that he should not make a statement. Norlander, Andrekus and Quadrini engaged in a conversation about the United States Navy, Quadrini's family, and the problems Quadrini had been experiencing with alcohol. Quadrini admitted that he tended to get violent when he was inebriated and frequently had trouble remembering what had happened dur-

**2.** The State of Wisconsin, Department of Justice card from which Detective Crichton read provided as follows:

"You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to consult with a lawyer before questioning and have a lawyer present with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before or during any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop the questioning and remain silent at any time you wish and the right to ask for and have a lawyer at any time you wish, including during the questioning. Do you understand each of these rights?"

**3.** The first-degree murder charges were based on statements made by the owners of the Glynholm Motel, the results of an autopsy performed by the Kenosha County coroner's pathologist, and the results of the search and contents of Quadrini's flight bag. The statements of the owners established that the petitioner shared

the room Leverett rented on May 17, 1980, the night of his murder, and that he checked out of the room just prior to the discovery of Leverett's body on May 18, 1980. The pathologist concluded that Leverett died of strangulation on May 18, 1980, and noted that there was a distinct pattern on his neck consistent with the pattern of a belt found in Quadrini's flight bag, along with articles of clothing belonging to the deceased.

**4.** At the initial appearance after the complaint was filed, Quadrini met with Public Defender Dennis Egre for the first time and requested a preliminary hearing. The preliminary hearing was held on May 29, 1980. At the preliminary hearing, Egre was relieved as the attorney of record because the petitioner and his family had retained a private attorney in the interim.

**5.** We note that Duma took the petitioner to the juvenile division solely for the purpose of conveniently interviewing the petitioner's cell mate. At the time of his arrest, the petitioner was an adult—he was 18 years of age and a high school graduate.

ing the time he was intoxicated. During this conversation Quadrini talked about the night of Leverett's death and stated that when he returned to the motel room Leverett was asleep under the covers. Norlander and Andrekus then inquired whether Quadrini had anything to do with Leverett's death. Quadrini responded by stating: "My body may have, but my mind didn't." Quadrini also spoke of his fantasies, including one of a sexual nature and the other of killing someone with his bare hands. This conversation continued until Sergeant Duma entered the juvenile office.

When Duma entered the office at approximately 8:30 p.m., the detectives, in the presence of the petitioner, informed Duma that Quadrini had made an incriminating statement. Norlander further informed Duma that the petitioner had been advised by an investigator from the public defender's office not to make a statement, but that after Norlander had apprised him of his rights, Quadrini chose to make a statement anyway. After Duma entered the office, Quadrini took the business cards of the public defender and his investigator from his pocket and displayed the cards on the table in front of Duma, Norlander and Andrekus, but the three officers had no discussion concerning them. Sergeant Duma subsequently questioned Quadrini, in the presence of the two detectives, and Quadrini stated that he felt he had a problem with violent behavior following excessive drinking. Duma advised Quadrini that if he had anything to do with the death of David Leverett, undoubtedly, he did have a problem. Duma also told the petitioner that admitting he had anything to do with the murder would take a great deal of courage, but would be a step toward seeking help for his drinking problem. Quadrini then calmly told Duma, Norlander and Andrekus what had happened after he entered the motel room, describing in detail how he had strangled Leverett with his belt.

Thereafter, Duma called Kenosha County District Attorney John Landa and asked him to come to the Department. The District Attorney talked to Quadrini for approximately 45 minutes and inquired about Quadrini's schooling and his present state of mind in order to satisfy himself that Quadrini had not been threatened or coerced or given any promises to induce him into confessing. Quadrini replied that no threats, promises or other coercive measures had been employed by the police officers. Landa also asked Quadrini about his conversation with the public defender's investigator. Landa questioned Quadrini at length as to whether he understood his rights, and Quadrini responded affirmatively, stating he understood his rights and that Detective Norlander had fully explained them earlier. Quadrini stated "that he just wanted to clear the matter up and get the help he felt he needed." At this point, District Attorney Landa and Norlander left the juvenile division. Duma and Andrekus again advised Quadrini of his rights. Quadrini once more stated that he understood his rights, signed a waiver of rights form, and repeated his incriminating statement on a tape recording. In this taped statement the petitioner specifically stated that Detective Norlander had informed him of his constitutional rights at 7 p.m. on May 19, 1980, and that it was his desire to give the law enforcement officers his statement despite being advised not to do so by the public defender's investigator. Despite Quadrini's assertion on tape that it was his intention to make an incriminating statement to the police, shortly thereafter on the advice of counsel, he changed his mind and petitioned the court on motion to have the entire taped statement suppressed.

On October 13, 1980, a pretrial suppression hearing was held at which seven police officers testified about the events leading up to the confession. Following the hearing, the state trial judge made the following findings:

"Going first to the statement of the 18th, I find that the defendant was in custody and when interviewed by Detective Crichton was properly advised of his *Miranda* rights and that the defendant understood them; and that there were no threats, promises or other improper inducements conveyed to the defendant in

return for giving any statement, so that I further find that the statement given by the defendant was knowingly and intelligently given, and I conclude that the statement was in all respects properly given and taken.

The court also finds that the defendant freely and voluntarily and knowingly and intelligently consented to the search of the bag and the seizure of the articles therein contained based upon his free and voluntary execution of the consent search received on this record as State's Exhibit no. 4.

The court further finds that the defendant in custody and after having been specifically advised by an investigator from the public defender's office and to not make any statement in which the court finds the defendant clearly understood, nevertheless freely and voluntarily and knowingly and intelligently chose to give a statement. I find that Detective Norlander properly gave the *Miranda* rights to the defendant at approximately 7 p.m. on 5–19–80, that the defendant understood them, and nonetheless, and with full understanding that he had been specifically advised not to make a statement chose to do so.

This court finds that the fact that the defendant had been specifically advised of such right and this court further finding that the defendant clearly understood those rights serves as a further basis for the conclusion that the heavy burden ... has been met [by the state] ... [to find] that the defendant did intelligently waive his right to have counsel present and to remain silent, and that he therefore freely and voluntarily proceeded to give a statement.

The court further finds that any statement made after that by the defendant to Detectives Norlander and/or Andrekus were thus freely and voluntarily, knowingly and intelligently given and trustworthy; and finally after conversation with District Attorney Landa, plus again being advised of his *Miranda* rights by [Sgt.] Duma the defendant knowingly and intelligently, freely and voluntarily and understanding such *Miranda* rights freely and voluntarily executed a written waiver of those rights and then proceeded to give a knowing and intelligent, free and voluntary statement which was taken on tape....

That statement is also concluded to be apparently trustworthy and inherently trustworthy, and therefore, the court will find that all such statements by the defendant are properly evidenced in this case."

Originally the petitioner entered a plea of not guilty and not guilty by reason of mental disease or defect. Subsequently, he withdrew his plea of not guilty by reason of mental disease or defect and entered a plea of not guilty to the charge of first-degree murder after the state refused to agree to, and the court refused to accept, the petitioner's waiver of a trial by jury.

A jury trial commenced on October 14, 1980, and concluded with a guilty verdict on October 18, 1980. The trial court entered a judgment of conviction and sentenced the petitioner to the mandatory term of life imprisonment. Quadrini appealed to the Wisconsin Court of Appeals, arguing that his statement of May 19 was involuntary due to the "maneuverings" of the police and the absence of counsel and that the trial court's refusal to allow the admission of psychiatric testimony on the issue of intent and to accept his waiver of trial by jury was error. The court of appeals affirmed Quadrini's conviction in an unpublished opinion. The Wisconsin Supreme Court denied review. Having exhausted his state remedies, Quadrini petitioned the United States District Court for the Eastern District of Wisconsin for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Quadrini again argues that his confession was involuntary and that the trial court erred in refusing to accept his waiver of trial by jury.[6] The district court denied Quadrini's petition for a writ of habeas corpus finding that Qua-

---

**6.** Quadrini did not raise the issue of whether the trial court erred in refusing to allow psychiatric testimony on the issue of intent in his habeas petition.

drini's confession did not in any way abridge his fifth and sixth amendment rights and that the issue regarding the court's refusal to allow Quadrini to waive his sixth amendment right to a jury trial failed to rise to the level of a constitutional violation. On appeal, the petitioner again argues the trial court erred in receiving his confession of May 19 in evidence because it was involuntary and violated his right to counsel under the fifth and sixth amendments. The petitioner also argues the trial court erred in refusing to accept his waiver of the right to trial by jury under the sixth amendment.

## II.

The first issue the petitioner raises on appeal is whether his confession of May 19 was involuntary due to the alleged "maneuverings" of the police interrogators and the absence of counsel. In support of his claim that the absence of counsel rendered his confession involuntary, the petitioner argues extensively that the state did not meet its burden of proof under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or the sixth amendment as to whether he waived his right to counsel. For the sake of clarity, we separate the analyses of the right to counsel under *Miranda* and the sixth amendment; we initially address the petitioner's fifth amendment claims, including the waiver of right to counsel under *Miranda,* and next address the sixth amendment right to counsel issue.

### A.

At the outset, we set forth the appropriate standard of review governing our evaluation of the petitioner's fifth amendment claims. In *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 457, 88 L.Ed.2d 405, 412 (1985), a case involving a claim of a coerced confession, the Supreme Court held that the ultimate question of whether a confession is voluntary is a matter "for independent federal determination." *Miller* expressly stated, however, that subsidiary factual findings are entitled to the presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 112, 106 S.Ct. at 451, 88 L.Ed.2d at 412. We have recently noted that whether a defendant voluntarily made a knowing and intelligent waiver of his *Miranda* rights is a factual determination and, thus, state court findings on this issue are entitled to a presumption of correctness under § 2254(d) of the United States Code. *See Bryan v. Warden, Indiana State Reformatory,* 820 F.2d 217 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Perri v. Director,* 817 F.2d 448 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). This is especially true where, as in this case, these issues depend solely on the credibility of the witnesses. *Richardson v. Duckworth,* 834 F.2d 1366, 1372 (7th Cir. 1987).

■ The petitioner contends the state did not meet its burden of proof in establishing that he waived his right to counsel. The petitioner alleges that the state could not prove a valid waiver in this case because the police continued to question him after he had allegedly invoked his right to counsel. Under *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981), once a defendant "has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he had been advised of his rights." The petitioner argues that he invoked his right to counsel when he showed the business cards of the public defender and his investigator to Duma, Norlander and Andrekus and advised the officers that the investigator had told him not to make a statement. The Wisconsin Court of Appeals, as well as the district court, concluded that the display of the business cards and the content of the accompanying statement were insufficient to invoke the petitioner's right to counsel. Moreover, both reviewing courts found that in addition to informing Norlander and Andrekus of the investigator's advice, Quadrini unequivocally and in clear and unambiguous terms stated that he did not want an attorney

present.[7] Our independent review of the record establishes that the determinations of the Wisconsin Court of Appeals and the United States District Court are supported in the record, and thus we agree that the petitioner did not invoke his right to counsel during his interrogation. We hold that the waiver standard set forth in *Edwards* is inapplicable to the facts of this case.

■ Having concluded that the Wisconsin state courts did not apply an incorrect waiver standard, we next determine whether the state courts' findings of fact are supported in the record. Under Wisconsin law, in order to establish a waiver of the right to counsel under *Miranda*, "the state must show ... the defendant understood his right to counsel and voluntarily waived that right." *Jordan v. State*, 93 Wis.2d 449, 464, 287 N.W.2d 509, 516 (1980). This requirement was derived from the federal standard for determining waiver: whether there was "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938).

In this case, the Wisconsin state courts found not only that Detective Norlander sufficiently apprised the petitioner of his *Miranda* rights, but also that the petitioner understood his rights and knowingly and intelligently made a voluntary waiver of these rights. The record shows that Norlander read the petitioner his *Miranda* rights at approximately 7 p.m. on May 19. The petitioner acknowledged that he understood his right to have an attorney present, and further, in clear and unambiguous language, stated that he did not want an attorney even though he had been advised by the investigator from the public defender's office not to make a statement. Later that same evening, Quadrini stated to District Attorney Landa that Detective Norlander had fully explained his rights to him, that he understood them, and that "he just

wanted to clear things up and get the help he felt he needed." After making this statement, the officers once more informed Quadrini of his *Miranda* rights. Quadrini then signed a waiver of rights form and repeated his incriminating statement on a tape recording. From our review of the record, we are convinced that Quadrini freely and voluntarily signed the waiver form with full understanding of the rights he was relinquishing.

Quadrini challenges the state trial court's findings alleging that some of the officers' testimony is in conflict with the testimony of other officers. From our review of the record, we do not agree with the petitioner's contention that the testimony of Duma, Andrekus and Norlander was in any way inconsistent. Even if we were to concede that there may be some minor inconsistencies, they are of no consequence. We emphasize that the trial court is always in the best position to review, weigh and determine the credibility of the witnesses and resolve any inconsistencies in their testimony. *See Miller v. Fenton*, 474 U.S. at 114, 106 S.Ct. at 452, 88 L.Ed.2d at 413–14. As we have previously stated:

"[W]e defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well-settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984))."

*United States v. Vega*, 860 F.2d 779, 794 (7th Cir.1988). We have reviewed the record and conclude that it clearly supports the trial court's finding that the petitioner knowingly, intelligently and voluntarily

---

7. The district court went on to state:
"This case is clearly distinguishable from *Smith v. Illinois*, 469 U.S. 91[, 105 S.Ct. 490, 83 L.Ed.2d 488] (1984), in which the [Supreme Court] found that the young defendant's statements were equivocal concerning his right to

counsel and his right to remain silent. Quadrini did not equivocate."
*Quadrini v. Clusen*, No. 84–C–1098, at 7 (E.D. Wis. April 13, 1987). We agree with this finding of the district court.

waived his fifth amendment rights to remain silent and to have counsel present during interrogation. We therefore conclude that the state has met its heavy burden and proved that the petitioner waived his rights under *Miranda v. Arizona, supra.*

In addition, the evidence overwhelmingly demonstrates that Quadrini was not coerced or induced to waive his rights. The Wisconsin Court of Appeals found that the petitioner was not threatened in any way, nor were any promises made to induce him into confessing. In his petition to the district court and on appeal to this court, however, the petitioner maintains that the law enforcement officers coerced him into making a confession. In support of this contention, Quadrini focuses on two aspects of his conversation with the police. First, Quadrini alleges that Detective Norlander "maneuvered" him into confessing by indicating that he merely intended to have a general, friendly conversation about the United States Navy and Quadrini's home life, but eventually directing the discussion toward "the true topic of interest—the death of David Leverett, thereby revealing his actual interrogative intent." The record reveals that prior to engaging in any conversation with Quadrini, Norlander read him his *Miranda* rights thereby putting Quadrini on notice that anything he said, related to Leverett's death or otherwise, could be used against him at trial. In light of this fact, we fail to understand how Quadrini can allege that he did not have notice of Norlander's "actual interrogative intent" until the conversation turned to the subject of Leverett's death. In any event, we hold that Detective Norlander's casually conversing with Quadrini before asking him if he had been involved with Leverett's death was neither deceitful nor unfair, but rather normal and accepted police investigative procedure.

Quadrini next makes reference to his conversation with Sergeant Duma. In response to Quadrini's statement that he had a problem with alcoholism and that he might have killed Leverett but could not be sure because of his alcohol-induced memory loss, Duma stated that if Quadrini had been involved with Leverett's death, then he indeed had a drinking problem. Duma then told Quadrini that admitting to this fact would take a great deal of courage but would be a step toward seeking the help that he needed for his alcoholism and violent behavior. Quadrini argues that this statement was the equivalent of a "positive" promise to get him alcohol treatment in exchange for his confession and characterizes Duma's overall sympathetic tone as "a collateral benefit of sorts likely to lead a defendant to confess." We do not agree that Duma's statement and overall tone of voice can be characterized as a "positive" promise or any other benefit to Quadrini. However, even assuming *arguendo* that Quadrini's dubious characterizations are accurate, we are not persuaded from our reading of the trial record that he was coerced into confessing by Duma's actions.

In *Sotelo v. Indiana State Prison,* 850 F.2d 1244, 1249 (7th Cir.1988), a police polygraph examiner used an empathetic tone with an accused murderer after confronting the accused with the negative results of the polygraph and the accused thereafter confessed because "the man who ran the lie detector talked to me nice like a father." This court stated:

> "Placing a defendant in a relaxed and comfortable mood by the use of empathetic conversation for three or four minutes does not rise to a level of psychological manipulation. *See Miller v. Fenton,* [796 F.2d 598, 607 (3d Cir.1986)]. Further, as stated in the *Miller* case on remand, 'the Supreme Court has indicated that a sympathetic attitude on the part of an interrogator is not in itself enough to render a confession involuntary. *See, e.g., Beckwith v. United States,* 425 U.S. 341, 343, 348, 96 S.Ct. 1612, 1614, 1617, 48 L.Ed.2d 1 (1976), (interrogator adopted sympathetic attitude but resulting confession was voluntary).' Even where a friendly interrogator's questioning involved misrepresentation of facts the Supreme Court has held that there was no error in the admission of a defendant's confession. *Frazier v.*

*Cupp,* 394 U.S. 731, 737–40, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969)." *Sotelo,* 850 F.2d at 1249–50. Additionally, Quadrini's contention that he was given the equivalent of a promise for alcoholism treatment in exchange for his confession, even if true, would not be enough to show that he was coerced into making a confession. *See Cole v. Lane,* 830 F.2d 104, 109 (7th Cir.1987) (per curiam), *cert. denied,* — U.S. ——, 108 S.Ct. 1053, 98 L.Ed.2d 1015 (1988) (holding that the defendant's confession was voluntary notwithstanding "firm promise of leniency" made from the police while attempting to induce the defendant's cooperation).

We have discovered no evidence in the record to support the petitioner's claim that he was unconstitutionally manipulated into confessing to the murder of David Leverett. Thus, we agree with the trial court's finding that the petitioner was neither coerced nor induced into waiving his right to remain silent and confessing.

■ Finally, according the Wisconsin state courts' findings of fact the § 2254(d) presumption of correctness, and independently finding no evidence establishing that Quadrini's confession was compelled due to the absence of counsel or police misconduct, we hold that under the totality of the circumstances the petitioner freely, voluntarily, intelligently and without coercion confessed to the murder of David Leverett. Thus, we affirm the district court's finding that Quadrini's fifth amendment rights were not violated during or as a result of his interrogation at the Kenosha County Sheriff's Department on May 19, 1980.

### B.

In addition to his fifth amendment claims, the petitioner also contends that his confession should have been suppressed because it was taken in violation of his right to counsel under the sixth and fourteenth amendments. The Supreme Court held in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), that absent a valid waiver, confessions elicited from an accused after the right to counsel has attached violate the sixth and fourteenth amendments if they were elicited outside the presence of counsel. This standard requires us to answer three questions: (1) whether the right to counsel had attached at the time of the confession; (2) if so, whether the accused executed a valid waiver of his right to counsel; and (3) absent a valid waiver, whether the police conduct violated the accused's right to counsel. *See* 2 W. Ringel, *Searches & Seizures, Arrests and Confessions,* § 29.1 (2d Ed. 1988). Under the facts of this case we find it necessary to address only the first two questions, namely whether the sixth amendment right to counsel had attached and whether Quadrini validly waived that right.

■ The threshold inquiry in this case is whether the petitioner, in fact, had a right to have counsel present during his interrogation by Norlander, Andrekus, Duma and Landa. In other words, we must determine whether the petitioner's right to counsel had attached at the time he had confessed. It is well established that a person is entitled to the service of a lawyer "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411, 417 (1972). The government admits in its brief that formal charges for the first-degree murder of David Leverett were filed against the petitioner on May 19, 1980. Under the rule stated in *Kirby,* adversary criminal proceedings were initiated against the petitioner at this point. The Supreme Court in *Brewer v. Williams, supra,* held that the sixth amendment right to counsel attaches at any interrogation after the initiation of formal criminal proceedings against an accused. It is therefore clear from *Brewer* that the petitioner's sixth amendment right to counsel had attached at the point when formal charges were filed against him on

May 19; thus, the petitioner had a right to have counsel present at his interrogation by the police later that same day.[8]

Because we have determined that the petitioner had a right to have counsel present during his interrogation, we must now determine whether he intelligently, freely and voluntarily waived that right. While *Brewer* held that an accused has such a right, the Court also explicitly stated that an accused can waive his right to counsel for purposes of an interrogation and that such a waiver can be effected without having obtained the advice of counsel previously. *Brewer*, 430 U.S. at 405–06, 97 S.Ct. at 1243, 51 L.Ed.2d at 441. As with a waiver under *Miranda*, the government must prove "an intentional relinquishment of a known right or privilege." *Johnson v. Zerbst, supra.* The petitioner argues extensively that the sixth amendment should impose a heavier burden on the state than that under *Miranda* to prove waiver of a defendant's right to counsel. He contends that this heavier burden "may require greater explanation of the rights being relinquished and/or a more clearly expressed waiver than that mandated by *Miranda.*" In support of this argument, the petitioner substantially relies on *United States v. Mohabir*, 624 F.2d 1140, 1151–53 (2d Cir.1980), in which the Second Circuit imposed a requirement that before a valid waiver can be executed, a federal judicial officer must explain to the accused the significance of the sixth amendment right to counsel. The petitioner ignores the fact that this court has previously considered the *Mohabir* decision and held: "We decline to impose a rigid test for determining when the accused validly has waived his sixth amendment right to counsel. Rather, whether the accused has waived his sixth amendment right depends on the individual circumstances of each case." *Robinson v. Percy*, 738 F.2d 214, 222 (7th Cir.1984) (citing *United States v. Springer*, 460 F.2d 1344, 1350–52 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972)). *See also Love v. Young*, 781 F.2d 1307, 1317 (7th Cir.) (per curiam), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986).

More importantly, the Supreme Court last term in *Patterson v. Illinois*, 487 U.S. ——, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), addressed the question of whether a "knowing and intelligent" waiver of the right to counsel under the sixth amendment requires additional warnings or explanations other than those required by *Miranda.* The Court rejected the *Mohabir* analysis and held:

"an accused who is admonished with the warnings prescribed by this Court in *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one. We feel that our conclusion in a recent Fifth Amendment case is equally apposite here: 'Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.' See *Moran v. Burbine*, 475 U.S. [412] at 422–423, 106 S.Ct. [1135] at 1142 [89 L.Ed.2d 410 (1986)]."

---

8. We note as a matter of some significance that the petitioner's right to counsel did not attach at the time of the bond hearing on May 19, 1980. The petitioner was arrested without a warrant on May 18, 1980, *see* note 1 *supra;* as a result, the state was required to take the petitioner before a magistrate for a determination of probable cause to detain the petitioner pending further proceedings. *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 65 (1975). The Supreme Court in *Gerstein* stated that this determination is not a "critical stage" at which the sixth amendment right to counsel attaches. *Id.* at 122, 95 S.Ct. at 867, 43 L.Ed.2d at 70. Although the bond hearing and the filing of formal charges against the petitioner occurred at different times on the same day, we emphasize that each of these judicial proceedings is separate and distinct with regard to its significance as related to a constitutional challenge under the sixth amendment.

*Patterson,* 487 U.S. at ——, 108 S.Ct. at 2396–97, 101 L.Ed.2d at 275 (footnote omitted). Accordingly, we reject the petitioner's argument that something more than the *Miranda* warnings are required to effect a waiver of the sixth amendment right to counsel.

We have reviewed the facts and circumstances of this case in our discussion of waiver under *Miranda, supra.* We see no need to repeat a detailed review of those same facts. The record clearly establishes that the petitioner had been repeatedly advised of his rights and that the petitioner repeatedly stated that he understood them. The record also demonstrates that on more than one occasion, the petitioner freely, voluntarily and intelligently waived his right to have an attorney present. His statement that the investigator from the public defender's office advised him not to talk to the police and his knowledge that he was scheduled to meet with the public defender at his initial appearance the following day, combined with his clear, unambiguous statement of waiver, make it clear that the petitioner understood his right to have counsel present and fully intended to waive it. The state has more than satisfied the standards for waiver set forth in *Johnson v. Zerbst, supra.* Accordingly, we affirm the district court's finding that the May 19 interrogation of the petitioner did not abridge his right to counsel under the sixth amendment.

### III.

The petitioner next claims that the trial court erred in refusing to allow him to waive his right to a jury trial without the consent of the state. Under Wisconsin law, criminal cases must be tried by 12–member juries "unless the defendant waives the jury ... with the approval of the court and the consent of the state." Wis.Stat. § 972.02(1). The state did not consent to the petitioner's proposed waiver of his right to trial by jury, nor did the trial court approve; thus, the statute mandated that the trial court refuse the petitioner's waiver.

The petitioner advances numerous policy arguments to support his conclusion that "when an accused reaches an informed decision that a trial to the court is in his best interest, he should not be compelled by the prosecutor to have a jury trial...." Even if we agreed with the petitioner, which we do not, such arguments could not be considered here. Federal habeas corpus review of custody resulting from a state court judgment is strictly limited to claims that the custody is "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a). The petitioner does not claim that the Wisconsin statute is unconstitutional; nor could he make such a claim because the Supreme Court, in *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), upheld Federal Rule of Criminal Procedure 23(a), which is the model for the Wisconsin statute. Because the petitioner's claim is not framed in constitutional terms, we are without jurisdiction to consider it on habeas review. As noted by the respondent, the petitioner's argument is better suited for the United States Congress or the Wisconsin legislature. We affirm the findings of the district court.

### IV.

We hold that the district court properly analyzed the facts of the case and applied the appropriate legal principles to those facts. Accordingly, the district court's denial of Quadrini's petition for writ of habeas corpus is

AFFIRMED.