**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Concepcion CARRASCO and Francisco Diaz, Defendants–Appellants.**

Nos. 88–2103, 88–2104.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1989.

Decided Oct. 19, 1989.

Joel Bertocchi, David J. Stetler, Crim. Receiving, Appellate Div., Bobbie McGee Gregg, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Jerome Feldman, Feldman & Halprin, D. Ashley Pennington, FPD Federal Public Defender, Chicago, Ill., for Concepcion Carrasco.

Judith A. Halprin, Mitchell H. Caplan, Feldman & Halprin, Chicago, Ill., D. Ashley Pennington, Federal Public Defender, Chicago, Ill., for Francisco Diaz.

Before POSNER, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Concepcion Carrasco and Francisco Diaz appeal their convictions following a trial to the court for conspiring to sell and selling counterfeit alien registry cards and social security cards in violation of 18 U.S.C. §§ 371 and 1426(b) and 42 U.S.C. § 408(g)(3). We affirm.

### I.

The Immigration and Naturalization Service ("INS") received information that an individual, later identified as Concepcion Carrasco, was selling counterfeit documents. On October 12, 1986, the INS requested a confidential informant, Guillermo Herrera, to purchase false alien registry cards[1] and social security cards. During the period documents were purchased the government tape-recorded a number of meetings and telephone conversations between Herrera and the defendants Concepcion Carrasco and Francisco Diaz from October 1986 to March 1987. At trial, fourteen of these recorded meetings and telephone conversations were admitted in evidence together with Spanish and English transcripts thereof.

The first conversation between Herrera and a defendant involving arrangements for the purchase of counterfeit documents took place on October 12, 1986, when Herrera and another individual met with the defendant Carrasco outside of Carrasco's home on Noble Street in Chicago, Illinois. During the meeting Herrera and Carrasco explored the possibility of Herrera purchasing a green (alien registration) card from Carrasco for a friend from Mexico. The following recorded conversation transpired:

> "HERRERA: You know, I needed a 'mica' (Alien Registration Receipt Card), for a friend. I met him, the man, at an office where I went to look for work. He told me that you would probably— that I need for a friend. You know, it is difficult to obtain the 'mica' and you know, every place one goes for work, well, they ask for it.

---

1. In the Mexican community alien registry cards are also known as "micas," and parties to conversations in the case used that term.

CARRASCO: Umm–Hmm.

HERRERA: Then, this guy just came from Mexico recently, he needs it—well, if it's possible.

CARRASCO: For when do you need it?

HERRERA: Well, I don't know when you can get it.

CARRASCO: Right now it is not possible.

HERRERA: No?

CARRASCO: I don't believe for this week.

HERRERA: Yes.

CARRASCO: The person who makes the— that takes care of this business is in Mexico.

HERRERA: He's in Mexico?

CARRASCO: Ummm.

HERRERA: Will it take him a long time to return? Well, who knows, he probably will.

CARRASCO: I believe he will be back by Saturday.

HERRERA: Yes.

CARRASCO: Friday—Saturday. (Pause)

CARRASCO: Look elsewhere, if you are not able to arrange anything, you come back and we will go see if he has returned.

HERRERA: Yes.

COOPERATING

INDIVIDUAL: We will come to look for you on Friday to find out.

CARRASCO: Ummm.

HERRERA: Alright, whatever you want. (Pause)

CARRASCO: If he were here, well, with pleasure."

Carrasco gave Herrera his telephone number before Herrera stated he would need a "mica" and a social security card. Herrera also told Carrasco that he would call to ascertain whether Carrasco had been able to arrange something and would inform Carrasco in the event he was able to secure a different supplier for the false documents. Carrasco quoted Herrera the prices of a "mica" at $50 and a social security card at $20.

On November 3, 1986, Herrera again met with Carrasco outside Carrasco's Noble Street residence. The conversation began:

"HERRERA: What's happening, Chon [Carrasco]?

CARRASCO: What's going on? Come in.

HERRERA: Ay!?

CARRASCO: It's getting chilly.

HERRARA: Very much, right?

CARRASCO: Yes.

HERRERA: I thought you were going to be right by the door what have you been doing?

CARRASCO: Yes, I was there except, that I was ready to "chicken out."

HERRERA: You got—you got cold, right?

CARRASCO: Yes."

Carrasco asserts that these statements reflect his desire to back out of the transactions with Herrera, while the government contends that they reflect only Carrasco's reaction to the cold weather. Herrera went on to tell Carrasco that he had been attempting to reach Carrasco by telephone. Herrera at this time reiterated his desire to purchase the alien registry and social security cards. Carrasco queried Herrera asking whether Herrera had brought the necessary data and photos for the false documents. After Herrera responded affirmatively, Carrasco stated that it would be impossible for the registry and social security cards to be produced that day, but told Herrera to call him Wednesday (two days later). Herrera informed Carrasco that: "[T]his guy is after me, you see? He says, 'Hurry up, hurry up,' right?" Three days later, on November 6, 1986, Herrera received the cards from Carrasco in exchange for $70 ($50 for the "mica" and $20 for the social security card). Herrera stated that he would contact Carrasco "as soon as I need something," and Carrasco asked Herrera not to say anything over the telephone other than that Herrera was coming to see Carrasco at a particular time. Carrasco obviously was attempting to protect himself from any incriminating statements made during a possible wiretapped conversation.

Some two months later, on January 5, 1987, Herrera once more met with Carrasco and ordered another "mica" for one, "Juan Ortega Patino." Herrera told Carrasco of the pressure he was under to secure the

card as quickly as possible. A week later Herrera phoned Carrasco, inquiring about the card, and Carrasco stated that he had not yet picked up the "mica," "because the people were busy yesterday." Herrera and Carrasco agreed to meet the next day at 7 p.m. Two days thereafter, on January 14, 1987, Herrera met with Carrasco, paid him $50 and received the "mica." Herrera asked Carrasco if he could deal directly with Carrasco's source, to which Carrasco replied, "I don't know." Carrasco spoke to Herrera about the difficulty he had in contacting his source. He also stated: "I also don't make any of these. I make them for friends, only because I don't want to tell them no."[2] Carrasco further informed Herrera of the savings that are realized when the "mica" and social security cards are purchased together and of the possibility of pricing the documents in a fashion that would allow Herrera to make some money in resale transactions.

On February 5, 1987, Herrera again met with Carrasco at Carrasco's new home on Ohio Street in Chicago, Illinois, and ordered another "mica" and social security card. Carrasco testified that he never informed Herrera of his new address and had no idea how Herrera found him. Carrasco said that he would see if he could have the documents three days later. Having no phone, Carrasco suggested to Herrera that he call at the old Noble Street house and leave his name. Carrasco gave these additional directions:

"CARRASCO: Ask for Pancho.

HERRERA: For Pancho?

CARRASCO: For Pancho.

HERRERA: Heh.

CARRASCO: Pancho—Francisco. His name's Pancho.

HERRERA: Heh, Pancho.

CARRASCO: Then I will talk to him, then he will just give me your name and then I will tell him who I will be talking to."

Arrangements were made for Herrera to call on Monday (February 9).

On February 9, 1987, Herrera spoke with an individual who identified himself as "Pancho." Pancho informed Herrera that Carrasco had told him that the order would be ready the next day. In a subsequent phone call that same day, Herrera told Pancho that he would be unable to come on Tuesday (February 10), but could be there Wednesday (February 11) at 6 o'clock. On February 11 Herrera had several telephone conversations with Pancho, but was unable either to speak with Carrasco or obtain the desired documents. Pancho said he would determine if Carrasco was at Carrasco's residence. In his final February 11 call, Herrera told an unidentified individual that he would call the next day. In a February 12, 1987, telephone conversation, Pancho informed Herrera that the order was ready, and Herrera replied that he would come over. Herrera then met with Pancho at the Noble Street apartment, picked up the false documents and the following conversation ensued:

"HERRERA: How much do I owe you? How much did he tell you it was?

PANCHO: Did you talk to him?

HERRERA: Yes. He had told me the other time that it was $60.00. I don't know if he told you different.

PANCHO: No. He didn't tell me anything.

HERRERA: He didn't tell you? O.K. Then, here are the $60.00."

After Herrera gave Pancho the $60, Pancho delivered the green card and the social security card. Herrera testified that the documents were unwrapped when they were delivered, as contrasted with Carrasco's testimony that they were wrapped. The court resolved this conflict in favor of Herrera.

On February 23, 1987, Herrera met with Carrasco outside Carrasco's Ohio Street house to arrange for the purchase of another social security card. In making arrangements for the delivery of the document, Carrasco again directed Herrera to speak with the people living at the Noble Street residence:

---

**2.** Although this statement was somewhat contradictory, it may be interpreted as reflecting that Carrasco did not personally manufacture these cards but obtained the false documents from other individuals who manufactured them solely as a favor for his (Carrasco's) friends.

"CARRASCO: Well, just call the guys there.

HERRERA: I just call them?

CARRASCO: Yes, and ask for Pancho, for Francisco.

HERRERA: Huh-huh. Do they know what it's about and everything?

CARRASCO: Yes, yes, they are my brothers-in-law.

HERRERA: They are your brothers-in-law?

CARRASCO: Yes. You just have to tell them that you are coming.

HERRERA: Yes.

CARRASCO: They delivered the 'mica,' right?

HERRERA: Yes, they gave it to me.

CARRASCO: Who gave it to you?

HERRERA: Pancho.

CARRASCO: What does the man who gave it to you look like?

HERRERA: I asked for Pancho. He is light complected and he has a face that's—

CARRASCO: Yes.

HERRERA: He has a mustache.

CARRASCO: Huh-huh.

HERRERA: He has a round face.

CARRASCO: Huh-huh.

HERRERA: He is the one who gave it to me.

CARRASCO: Alright. I will leave it there with him."

The parties agreed that the purchase price would be $20, that the name on the card would be "Rafael Alvarez" and that the delivery would take place at the Noble Street house. During the conversation, Carrasco also told Herrera how he might save money if he purchased blank social security cards wholesale and made up the social security cards himself.

On March 2, 1987, Herrera telephoned "Pancho" and during the conversation Pancho informed Herrera that the item Carrasco was to drop off for Herrera had arrived. When Herrera arrived at the Noble Street house to pick up the items, he met an unidentified woman who inquired asking, was he there "about a social security?" Herrera replied he was, paid the woman $20 for the social security card and asked the woman if Pancho's last name was Carrasco. She stated that it was Diaz.

Carrasco testified that the money he received from these transactions was delivered to one Pedro Monarrez, who made the documents. Carrasco said that Monarrez offered to provide the necessary work documents for anyone Carrasco knew who needed them. Carrasco testified that he knew that the sale of counterfeit "micas" and social security cards was illegal. He further testified that he went through with the transactions because "Herrera told him that he needed [the documents] for a person who was not able to find work." Carrasco further testified that, "I wasn't doing it to make money for myself or to make any profit for myself because that was not my business."

### A. Carrasco's Arrest

On July 10, 1987, a grand jury returned indictments against Carrasco and Diaz for conspiring to sell and selling counterfeit alien registry and social security cards. On July 30, 1987, INS Agent Bruce Kading arrested Carrasco and informed Carrasco that he was "charged" with selling counterfeit immigration and social security documents. In relaying this information to Carrasco, Kading used the Spanish word "acusado," as a translation for "indicted." Carrasco testified that Kading told him that he was being arrested "because [Kading] was investigating some phony documents," to which he replied that he had a lawyer and had applied for amnesty. While Carrasco was being transported to the INS office, in Kading's automobile, Kading advised Carrasco of his *Miranda* rights in Spanish rather than English. After arriving at the INS office, Kading again orally advised Carrasco of his rights, utilizing a printed Spanish language form. Carrasco stated that at times he was unable to understand Kading's Spanish very well and specifically did not recall Kading speaking to him about a lawyer. He acknowledged that Kading had on two different occasions told him that anything he said could be used against him in a court of law and on one occasion that if he decided to answer questions without a lawyer he could stop

the questioning and refuse to answer any other questions at any time. Carrasco further admitted that he signed a waiver of rights form in the Spanish language; however, he said he did not understand what certain words meant, and further that Kading was talking to him about his voice on a tape at the time he was signing the waiver. He also said that Kading ignored his references to his lawyer, although he does not allege that he requested the presence of a lawyer at any time during his arrest, transportation and questioning. Carrasco stated that he made an oral statement admitting that he sold documents to Herrera on four separate occasions and identified his own voice in a tape recorded conversation with Herrera. Agent Kading then asked Carrasco to make a written statement, and Carrasco refused, stating that he did not wish to do so until he consulted an attorney. At this point, the interview concluded.[3]

### B. *Tape Recording, Duplication, Transcription and Identification Procedures*

#### 1. Tape Recording and Duplication Procedures

The tape recordings of the false document transactions were produced under the supervision of INS Agent Bruce Kading. Telephone conversations were recorded by means of an induction coil connecting the earpiece of the telephone to the microphone jack of the tape recorder. Before each conversation Kading tested the re-

corder by replaying a portion of the preamble he had dictated on the tape. Kading then placed the telephone calls to Carrasco and Diaz and monitored the conversations. Following the recording of each conversation, Kading played back a part of the taped conversation to ascertain if, in fact, a recording had taken place. Kading then removed each tape and personally transferred the tape to a locked cabinet to which only he had access.

The conversations were recorded through the use of a tape recorder that Kading placed on the body of Herrera.[4] Because the conversation took place outside the INS office, Kading placed the tape in his combination locked briefcase and later transferred the tape to the locked cabinet in the office. Kading had exclusive access and control over the briefcase and cabinet.[5]

After Kading prepared the duplicate tapes, the original tapes were transferred to the prosecutions officer for safekeeping in the INS locked evidence room,[6] while the duplicate tapes were delivered to Eloise Mendez, an INS employee, for transcription purposes.[7] These duplicate tapes were used by Herrera in identifying voices on the tapes and were subsequently introduced in evidence at trial.

#### 2. *Transcription and Translation Procedures*

Initially Mendez prepared the English and then the Spanish transcripts of the Spanish conversations involved in this case.

---

**3.** On that same day Francisco Diaz was arrested at his Noble Street residence. Kading interviewed Diaz at the INS office in Spanish for approximately one and one-half hours. The district court judge adopted a magistrate's recommendations that statements made during this interview be suppressed on the basis that Agent Kading told Diaz a lawyer was unnecessary because the charges against him were not very serious. The suppression of this evidence resulted in dismissal of three counts against Diaz. This issue is not before us on appeal.

**4.** Kading had previous training and experience in the use of this equipment.

**5.** Agent Kading made duplicates of all of the involved tapes for transcription purposes. The telephone conversation tapes were duplicated in a high speed copier. Another agent had instructed Kading in the use of this machine some

five years previously, and Kading had prepared duplicate tapes on the machine on many prior occasions. The personal conversations were duplicated through the attachment of the Nagra recorder to a separate cassette recorder. Kading had also received training concerning the duplication of Nagra recordings and had prior experience in producing duplicate tapes.

**6.** Only the prosecutions officer had access to and control over the evidence room.

**7.** Mendez spoke Spanish in her home, learned English in school, and had been employed by the INS as an interpreter for some 18 years (since 1971). In that capacity she has transcribed and translated tape recordings and has also acted as an interpreter in court.

Mendez, after listening to the taped Spanish conversations, translated and typed them in English. After producing an English transcript, Mendez reviewed each tape and, in order to arrive at the most accurate translation and transcription of the recorded conversations, edited the transcripts when necessary. While editing the transcripts, Mendez merely corrected the spelling errors and the translations in the transcription as well as segregating the voices of the individual speakers, one from another, identifying only Herrera's voice (the confidential informant).[8] Prior to one of these revisions, Herrera identified his own voice as well as the voices of others on the tapes and his voice identifications were incorporated into the revised transcripts. With the exception of Herrera's identification assistance, Mendez prepared the transcripts completely on her own. The certification she affixed to each of the transcripts reflected that she translated the involved transcript on a specific date in April of 1987, while cross-examination testimony revealed that the editing procedure referred to, in fact, had occurred at a date later than April of 1987.

### 3. Identification Procedures

Herrera testified that he was one of the participants in all the tape recorded conversations admitted in evidence and that each of the tapes and Spanish transcripts accurately reflected the conversations that had transpired in his presence.[9] Herrera further identified Carrasco in court as the individual he had met and whom he knew as "Chon." On the other hand, Herrera was unable to make an inperson identification of the defendant Diaz in court as the person he knew as "Pancho." [10]

Other evidence was offered to identify Francisco Diaz as a participant in the taped conversations and transactions. For example, the record reflected that Agent Kading placed telephone calls to "Pancho" at a telephone number to which Jose Diaz subscribed at the address on Noble Street where Diaz was arrested.[11] In addition, Agent Kading spoke to and heard Diaz speak in Spanish on three occasions.[12] Kading testified, based on his exposure to and recollection of Diaz' voice, that Diaz' voice and the voice of Pancho on three of the recordings were the same voice. Moreover, Libia Ospina, who was employed at Diaz' place of employment and who knew and had spoken with Diaz on previous occasions at work, testified that she recognized Diaz' voice on a recording introduced in

---

**8.** We have observed in a previous Spanish–English translation case that:

"In our view, a foreign language translation is sufficiently accurate to assist the jury if the translation reasonably conveys the intent or idea of the thought spoken. It is axiomatic that a translation of most foreign languages to English (and vice versa) can never convey precisely and exactly the same idea and intent comprised in the original text, and it is unrealistic to impose an impossible requirement of exactness before allowing a translation to be considered by a jury."

*United States v. Zambrana,* 841 F.2d 1320, 1337 (7th Cir.1988) (footnotes omitted). For example, words could be subject to exact translation, but differences in grammar between languages could preclude exact translation of entire sentences. Thus, it would be normal to expect minor corrections in translation to occur between different drafts of a translated transcript.

**9.** Because Herrera does not speak English, he did not testify concerning the accuracy of the translation from Spanish into English set forth in the English transcripts.

**10.** Thus, with respect to Francisco Diaz, Herrera's testimony went to establish that the tapes and transcripts accurately depicted Herrera's conversations and transactions with an individual known to him as "Pancho," who was also known as Francisco Diaz. Herrera's inability to identify Diaz likely resulted from the fact that he had only a fleeting, nighttime transaction with Diaz.

**11.** The court was certainly entitled to infer that Francisco Diaz resided at the Noble Street location when considering that Diaz was arrested at this location, the subscription of the telephone in the name of Jose Diaz, Carrasco's conversations directing Herrera to contact Pancho at this telephone, and Pancho's delivery of false identification documents to Herrera at this address.

**12.** These instances were during Kading's one and one half hour interview with Diaz following his (Diaz') arrest, during Diaz' half-hour testimony at the suppression hearing and at the time Diaz furnished a voice exemplar at the INS office.

evidence.[13]

## II.

## ADMISSION OF TAPES AND TRANSCRIPTS

### A. *Admission of Tapes*

Carrasco and Diaz object to the admission of all of the tape recordings introduced in evidence on the grounds that the duplicate recordings received in evidence were neither true nor accurate recordings of the involved conversations and that both defendants' voices on the tapes were neither properly identified nor authenticated. In *United States v. Alvarez*, 860 F.2d 801, 807 (7th Cir.1988), we recently set forth the analysis to be applied in our review of a trial court's decision on the admission of tape recordings:

"We previously have held that '[t]ape recordings are only admissible if the government can establish, by clear and convincing evidence, that the recordings are "true, accurate and authentic recording[s] of the conversation[s], at given time[s], between the parties involved."' *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)). The district court must determine whether 'the recordings involved conversations that occurred between defendants in this suit.' *Id.*

. . . It is well established that a district court's general evidentiary rulings will be reversed only upon a showing of clear abuse of discretion. This standard also governs our review of a district court's decision to admit voice recordings."

(Citations omitted). In addition:

"As we stated in *United States v. Faurote*, '[t]he trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent "extraordinary circumstances."' 749 F.2d at 43. Moreover, because '[t]he trial judge [is] in the best position to weigh the credibility of the parties and the evidence presented,'

*id.* at 44, 'the trial judge exercises broad discretion in determining whether [the government's] burden has been satisfied.' *Id.* at 43."

*United States v. Zambrana*, 841 F.2d 1320, 1339 (7th Cir.1988). *See also United States v. Shukitis*, 877 F.2d 1322, 1327–28 (7th Cir.1989).

### 1. True and Accurate Recordings

The defendants challenge the truth and accuracy of the tape recordings involved, arguing that the government failed to establish that the tapes were true and accurate recordings of the conversations that had occurred at the particular time in question, also that the tapes were "duplicates" and not the original tape recordings.

Federal Rule of Evidence 1001(4) defines a "duplicate" in the following manner:

"A 'duplicate' is a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original."

(Emphasis added). Federal Rule of Evidence 1003 provides that:

"A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

In the case of either an original or a duplicate tape the government may establish a foundation for accuracy and truth of the tape through "evidence of chain of custody and by the correspondence between the tape's version of the events . . . and the recollections of eyewitnesses to those events; in this circuit, either variety of evidence can establish a tape's foundation." *United States v. Blakey*, 607 F.2d 779, 787 (7th Cir.1979).

---

**13.** Ospina was not questioned concerning other recorded conversations. In addition, INS Interpreter Mendez testified that "Pancho" is a common nickname among Spanish speaking people for the Spanish name "Francisco," Diaz' given name.

■ In this case the truth and accuracy of the duplicate tapes was established through "the recollection[ ] of [an] eyewitness [ ] to [the] events." *Blakey,* 607 F.2d at 787. Confidential Informant Guillermo Herrera was a participant in each and every one of the recorded conversations received in evidence and testified that the duplicate tape recordings accurately depicted the conversations at which he was present between Carrasco, Diaz, the unidentified woman, the cooperating individual and certain other unidentified individuals. Unchallenged testimony as to the accuracy of the duplicate tapes received from a participant in every one of the taped conversations certainly provided a basis sufficient for the trial court to exercise its discretion in concluding that the duplicate tape recordings were true and accurate reproductions of the involved conversations.[14] Furthermore, because the recollection of the eyewitness and participant Herrera so clearly established the truth and accuracy of the recordings of these conversations, we need not go any further and consider evidence concerning the chain of custody in making this determination.

### 2. Authenticity

As in *Alvarez,* we next proceed to review the trial court's resolution of the issue of "the authenticity of the speakers' voices on the tapes." *Alvarez,* 860 F.2d at 808. As we observed in *Alvarez:*

"Rule 901 of the Federal Rules of Evidence provides guidelines for authenticating voices as a precondition for admissibility of evidence. The rule provides in relevant part:

(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

\*　　\*　　\*　　\*　　\*　　\*

(5) *Voice Identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker. Fed.R.Evid. 901(b)(5). As the advisory notes further clarify, '[s]ince aural voice identification is not a subject of expert testimony, the requisite familiarity may be acquired *either before or after the particular speaking which is the subject of the identification....'* Fed.R. Evid. 901 advisory committee's notes (emphasis supplied). Courts interpreting this rule have accepted its plain meaning. *See, e.g., United States v. Cerone,* 830 F.2d 938, 949 (8th Cir.1987) ('Any person may identify a speaker's voice if he has heard the voice at any time.'), *cert. denied,* — U.S. ——, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988); *United States v. Gironda,* 758 F.2d 1201, 1218 (7th Cir.) (witness was familiar with voice of defendant based on at least three conversations prior to telephone call at issue), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985)...."

860 F.2d at 808–09.

■ Under these standards, we hold that Carrasco's voice was properly identified and authenticated, as Guillermo Herrera, a party to each of the recorded conversations containing Carrasco's voice, identified Carrasco at trial as the person with whom he met and knew as "Chon." Thereafter he testified that each of the tapes involving Carrasco accurately depicted the contents of the conversations between Carrasco and himself.

■ Because Herrera had only one fleeting face-to-face contact with Diaz, that took place during the nighttime, he stated he was unable to provide a definitive in-court identification of Diaz. Herrera was able to testify that the tapes allegedly involving Diaz accurately depicted the contents of the phone conversations he had with an individual known to him only as

---

**14.** Herrera's testimony concerning the truth and accuracy of the conversations was supplemented with identification testimony provided by Agent Kading and Libia Ospina concerning Francisco Diaz.

"Pancho" on several occasions.[15] The government produced evidence of the identification of Diaz' voice on these tapes from other sources.[16] Two witnesses went beyond Herrera's testimony and also positively identified Diaz' voice on the tapes. Agent Kading testified that he heard Diaz' voice on several occasions,[17] and made a positive and unchallenged identification that, based upon his hearing of Diaz' voice, the voice of "Pancho" on three of the tapes was the voice of Diaz. Similarly, one of Diaz' co-employees, Libia Ospina, who had spoken with Diaz on previous occasions at work, testified that she was able to identify Diaz' voice on the only tape introduced in evidence about which she was questioned.

Circumstantial evidence is also useful in establishing voice identification. As we observed in *United States v. Grier*, 866 F.2d 908, 920–21 (7th Cir.1989):

"In addition to the direct identification evidence just considered, the record also presented very convincing circumstantial evidence identifying both Grier and his wife as parties to these conversations. We have previously recognized that circumstantial evidence oftentimes does aid in providing a basis for identification of recorded voices. *Cf. United States v. Vega*, 860 F.2d [779, 792 (7th Cir.1988)] ('Based upon the totality of the circumstances, including Mrs. Vega's self-identification, Jesus Zambrana's obvious recognition of Mrs. Vega's voice, her specific reference to events discussed by her husband in a preceding phone call, as well as the timing of her call, an identification of Mrs. Vega's voice on the tape was clearly appropriate'); *United States v. Puerta Restrepo*, 814 F.2d 1236, 1239 (7th Cir.1987) ('The authentication may be established by circumstantial evidence such as the similarity between what was discussed by the speakers and what each subsequently did')."

Several items of circumstantial evidence aid in the identification of Diaz as a party to the taped conversations. First, telephone calls to "Pancho" were placed to a telephone number at the Noble Street address where Diaz was arrested. This telephone was subscribed in the name of Jose Diaz, Francisco's brother, and was the phone number given Herrera by Carrasco where Herrera could make contact with "Pancho." Moreover, the Noble Street address was the location where "Pancho" had delivered false documents to Herrera. In addition, the person answering the telephone in these conversations when asked if he was "Pancho" answered, in effect, identifying himself as Pancho. Further, the unidentified woman who delivered the false social security card to Herrera stated that Pancho's last name was Diaz. Finally, INS Interpreter Mendez testified that "Pancho" is a common nickname for the Spanish name "Francisco," Diaz' given name. This circumstantial identification evidence, when considered together with the direct identification evidence previously discussed, certainly lends ample credence to the district court's exercise of its discretion in concluding that the government had convincingly identified Diaz as a speaker on each of the tapes of the conversations between Herrera and the person he knew as "Pancho."

We are of the opinion that the trial court did indeed properly conclude that the government met its burden of establishing, through clear and convincing evidence, "that the recordings [were] 'true, accurate and authentic recording[s] of the conversation[s], at given time[s], between the parties involved,'" *Keck*, 773 F.2d at 759 (quoting *Faurote*, 749 F.2d at 43).

### B. *Admission of Transcripts*

The defendants also challenge the district court's admission of the transcripts of

---

**15.** The circumstantial evidence identifying "Pancho" as Diaz in connection with these telephone calls is considered, *infra*.

**16.** As we will discuss in detail in Section III, *infra*, there was sufficient evidence to support a finding that "Pancho" and "Diaz" were the same persons.

**17.** These incidents were a one and one-half hour interview with Diaz following Diaz' arrest, Diaz' half-hour of testimony at the suppression hearing in this case and during Diaz' furnishing of a voice exemplar at the INS office.

the tape-recorded conversations, alleging that the transcript preparation process resulted in "alterations" affecting the transcripts' reliability, and further that suggestive procedures were utilized in the identification of the speakers involved.

█ We now turn to the defendants' challenge to the accuracy of the transcripts. The defendants argue that the corrections in the transcripts cast doubt upon the transcripts' accuracy. For example, the defendants assert that those familiar with the conversations (i.e., Herrera or Kading) never compared the various versions of the transcripts prepared during the revision process, that Herrera never compared the Spanish transcripts to the English transcripts, and that changes were made in the transcripts after the date Eloise Mendez certified to the accuracy of the transcripts. The reasoning contained in *United States v. Zambrana*, 841 F.2d 1320 (7th Cir.1988), is applicable to these objections. There we observed:

"The defendants initially maintain that the transcripts inaccurately reproduce the substance of the phone conversations. However, the record reveals that they had ample opportunity to challenge and did in fact challenge each and every portion of the government-prepared transcript through the cross-examination of the government witnesses who testified as to the accuracy of the government's translation. In addition, in spite of the defendant's [sic] having had access to all the tapes six weeks prior to trial, having had the transcript for 12 days prior to trial, and having produced their own expert witness to testify as to the accuracy of the government's translation, the defendants failed to present an alternative translation. Because the defendants had ample opportunity to either challenge specific portions of the government's transcript or to prepare an alternate version, they cannot now be heard to complain on appeal when they themselves failed to present an alternative tran-

script. We agree with the reasoning of the Fifth Circuit in *United States v. Llinas*, 603 F.2d 506 (5th Cir.1979) where the defendants challenged on appeal the accuracy of transcripts containing an English translation of taped Spanish conversations. The court held that ' "[o]nce we have concluded that the defendants could have challenged specific portions of the government's transcript or prepared an alternate version, it follows that they cannot be heard to complain on appeal because they failed to take advantage of their trial opportunity." ' 603 F.2d at 509 (quoting *United States v. Wilson*, 578 F.2d 67, 70 (5th Cir.1978))."

841 F.2d at 1335. We went on to note: "This procedure encourages the production of a stipulated transcript; and if that fails, it leaves the opportunity for either side to present its version of the disputed portion of the transcript to the jury. This procedure is not only desirable, but we believe it is the obligation of well-prepared defense counsel to attempt to facilitate the presentation of evidence and to see that true justice is rendered by attempting to work out an agreed transcript when they question the accuracy of the government's version or fail to present their own translations. In the case at hand, while the defendants did in fact challenge the accuracy of the government's translation of the tapes, the record discloses that they neither attempted to work out an agreed transcript nor presented one of their own. Hence, the transcripts were properly provided to the jury as an aid while listening to tape-recorded evidence." [18]

The defendants extensively cross-examined the government witnesses testifying as to the accuracy of the government's translation. Moreover, it is unclear from the defendants' appeal papers which particular aspects of the transcripts the defendants claim are inaccurate. During their cross-examination of Mendez, the defendants pointed to certain minor changes in translations contained in different drafts of the

---

**18.** *Id.* at 1336. Because the defendants' trial commenced on March 7, 1988, the day the *Zambrana* opinion was issued, their failure to follow

the specific procedures set forth in *Zambrana* is understandable.

transcripts that Mendez prepared. However, unless the defendants propose alternative translations and/or transcripts or, at the very least, point out the sections of the government's transcripts they allege to be inaccurate, a court is required to venture into the treacherous chasm of speculation as to what particular words or sections are allegedly inaccurate since it lacks a clear basis to review, much less exclude, the government-prepared transcripts on the basis of inaccuracy. Because the defendants failed to delineate the specific areas in which the government's transcripts were inaccurate, we refuse to speculate as to what specific section was referred to in their challenges to the accuracy of the transcripts. We conclude, based upon our review of the record, that the district court acted properly in admitting these transcripts.[19]

■ The defendants also claim that the attribution of voices in the transcripts was the result of an impermissibly suggestive identification process.[20] We have observed that: "'An identification procedure is impermissibly suggestive if it gives rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).'" *Alvarez*, 860 F.2d at 810 (quoting *Little v. Armontrout*, 819 F.2d 1425, 1433 (8th Cir.), *vacated on other grounds*, 835 F.2d 1240 (1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988)). The court must determine whether an identification is reliable under the "totality of the circumstances" standard. *Id.*

Application of the law set forth in *Alvarez* to the facts herein reveals that the procedures utilized in identifying the speakers in these transcripts were not suggestive. In *Alvarez* we determined that the "corruptive effect of the suggestive identification" was to be weighed against factors relevant to the question of likelihood of misidentification, including "'the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.'" *Alvarez*, 860 F.2d at 810 (quoting *Little*, 819 F.2d at 1433, which quoted, in turn, *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)). In the case before us the person who identified voices on the transcript during the course of transcript preparation was Guillermo Herrera, an eyewitness and active participant in each and every one of the conversations involved. Because Mendez merely distinguished between the voices of different speakers and identified only the voice of Herrera, an active participant in the conversation and the individual who ultimately supplied the positive identification of each voice, it is difficult to imagine how these transcripts could be suggestive.[21] Moreover, Herrera became familiar with Carrasco's voice during his participation in

---

**19.** In addition, as we noted in our factual discussion, we observed in *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir.1988) that:

"In our view, a foreign language translation is sufficiently accurate to assist the jury if the translation reasonably conveys the intent or idea of the thought spoken. It is axiomatic that a translation of most foreign languages to English (and vice versa) can never convey precisely and exactly the same idea and intent comprised in the original text, and it is unrealistic to impose an impossible requirement of exactness before allowing a translation to be considered by a jury."

Differences in grammar between languages, for example, could preclude exact translation of sentences. Accordingly, we are most reluctant to disturb a district court's admission of a trans-

lated transcript without some clear demonstration of inaccuracy.

**20.** It is important to note that the defendants do not allege that the identification of voices on the tapes, as opposed to the transcripts, was the result of an impermissibly suggestive identification procedure. *Compare Alvarez*, 860 F.2d at 809–11; *Zambrana*, 841 F.2d at 1338–39 (Cases involving allegations that designations of speakers on transcripts utilized during identification of voices on tapes resulted in improperly suggestive identification procedures).

**21.** Certainly one is assumed to possess sufficient familiarity with his or her own voice to preclude any contention that one's identification of one's own voice was the product of impermissible suggestion.

the taped conversations, and his testimony evidenced not the slightest uncertainty with respect to identification. Even though a year had elapsed between Herrera's final conversations with Carrasco and his identifications, we are convinced that the passage of time was of no significance in light of the fact that Herrera had been a participant in each of the conversations and was obviously familiar with Carrasco's voice. We are convinced that the identification of the speakers on the transcripts did not give rise to a likelihood of misidentification. Thus, we refuse to overturn the court's receiving the transcripts in evidence on the basis of alleged suggestive identification procedures.[22] Accordingly, the trial court properly exercised its discretion in admitting the transcripts into evidence.

### III.

### SUFFICIENCY OF THE EVIDENCE

Diaz contends that the evidence presented was insufficient to convict him of conspiring to sell and selling counterfeit alien registry cards and social security cards in violation of 18 U.S.C. §§ 371 and 1426(b) and 42 U.S.C. § 408(g)(3).

"In evaluating [Diaz'] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

"As we emphasized in *United States v. Giangrosso*, 779 F.2d 376, 382 (7th Cir.

1985): '[T]his court is not the trier of fact and we are required to uphold the [trier of fact's] verdict where "any rational trier of fact" could have found the defendant guilty of the crime.' ... 'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) which quoted, in turn, *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)."

*United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988). "This [evidentiary standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams*, 858 F.2d 1218, 1221 (7th Cir.1988).

"A conspiracy is a 'combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.'" *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983)). As we observed in *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983):

"Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict.... [M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence of a single act will suffice if the circumstances permit the inference that the presence of act was intended to advance the ends of the conspiracy.'"

---

**22.** Because Herrera never specifically identified Diaz as a participant to the conversations, the suggestiveness contention can go only to Herr-

era's identification of Carrasco's voice and his own voice.

(quoting *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)) (citations omitted). As we noted in *United States v. Grier*, 866 F.2d 908, 924 (7th Cir.1989):

> "To convict a defendant of participation in a single conspiracy with other defendants, it is sufficient if it is established that:
>
>> '[t]he parties to the agreement were aware that others were participating in the scheme. The co-conspirators must have "knowingly embraced a common criminal objective." *United v. Ras*, 713 F.2d 311, 314 (7th Cir.1983). However, there is no requirement that the participants in the plan "personally know the individuals involved ... [a]s long as the conspiracy continues and its goal is to achieve a common objective." *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, [474] U.S. [818], 106 S.Ct. 63, 88 L.Ed.2d 51 (1985) (citation omitted).'
>
> *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). Further, this court has held that ' "if each [defendant retailer] knew, *or had reason to know*, that other retailers were involved with the ... [drug kingpin's] organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the [trier of fact] *could find* that each had, in effect, agreed to participate in the overall scheme." *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir.1973) (emphasis added).' *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985). In other words, '[if] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them. *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985).' *Cerro*, 775 F.2d at 911."

"Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *Vega*, 860 F.2d at 793. "Because conspiracies are carried out in secret, direct proof of agreement is rare." *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) (citations omitted). As we observed in *Grier*, 866 F.2d at 923:

> " 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). ' "Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also Wisconsin Jury Instructions—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing that (sic) direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983)).' *Koenig*, 856 F.2d at 854."

In weighing both direct and circumstantial evidence

> "[Triers of fact] are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt*, 852 F.2d at 1511. Not only do we recognize the trier of fact's general knowl-

edge of the facts of life, we also acknowledge the trier of fact's role as the arbiter of credibility:

"[W]e defer to the [trier of fact's] determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the [trier of fact] and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir. 1985)."

*Vega*, 860 F.2d at 794.

■ Diaz argues initially that there was no evidence that a conspiracy existed between Carrasco and anyone else prior to the February 1987 date on which the government alleges that Diaz joined the conspiracy. In support of his position, Diaz asserts that the government's contention that a conspiracy existed between Carrasco and the manufacturer of the documents delivered to Herrera prior to February 1987 cannot be accepted. In recorded conversations between Carrasco and Herrera on October 12, 1986, January 12, 1987, and January 14, 1987, Carrasco made clear that the counterfeit identification documents Carrasco sold prior to February 1987 were made by someone other than himself. Similarly, in Carrasco's direct testimony he identified Pedro Monarrez as the documents' manufacturer. Thus, we are convinced that there was more than sufficient evidence in the record for the judge to conclude that Carrasco conspired with others prior to February 1987, irrespective of whether the government identified a particular individual as the manufacturer of the documents. *See generally, Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438,

443, 95 L.Ed. 344 (1951) ("Of course, at least two persons are required to constitute a conspiracy, but the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown") (footnote omitted).

■ Diaz next argues that the evidence remained insufficient to establish that a conspiracy existed prior to February 1987, because the government failed to demonstrate that the relationship between Carrasco and the documents' manufacturer prior to this date was anything more than that of a buyer and seller.

We are convinced that the record contains a plethora of facts and circumstances relevant to the character of the relationship between Carrasco and his document supplier being more than that of a buyer and seller. In the recorded conversations of October 12, 1986, November 3, 1986, January 5, 1987, and February 5, 1987, between Carrasco and Herrera, arrangements were made for Carrasco to purchase false social security and alien registry cards from his supplier for resale to Herrera. Pursuant to the arrangements, a person or persons other than Carrasco manufactured and/or printed a "mica" and social security card and delivered them to Herrera on November 6, 1986, delivered a "mica" to Herrera on January 14, 1987, and delivered a "mica" and social security card to Herrera on February 12, 1987. Carrasco's supplier(s), thus, delivered and received payment for printed false documents containing names identifying a person other than the individual they knew as Carrasco. In doing so they should have known, in the exercise of common sense and, thus, "must have known" that they were involved in an agreement leading to the resale and/or transfer of those documents to individuals other than Carrasco. As we have previously noted, "[if] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear

of what he might see if he opened them. *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.1985)." *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985).

Although "[o]ur cases make clear that merely purchasing drugs or other property from a conspiracy, standing alone, can never establish membership in the conspiracy," *United States v. Douglas,* 818 F.2d 1317, 1321 (7th Cir.1987), "one who buys from a conspirator for resale is a member of the conspiracy if he knows at least its general aims...." *United States v. Marks,* 816 F.2d 1207, 1212 (7th Cir.1987). But, Diaz asserts that *Marks* cannot be utilized to find a conspiracy in a case in which a conspiracy has not yet been formed and in which the purchase for resale provides the sole basis upon which a conspiracy is found. Furthermore, Diaz argues that *Marks* should not be applied to a case in which the trier of fact is basically concerned with whether the seller, rather than the buyer, has become part of a conspiracy.

In response to Diaz' assertions, we have previously noted: "Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *Vega,* 860 F.2d at 793. Furthermore, "the evidence ' "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." ' " *Koenig,* 856 F.2d at 854 (quoting *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) (that quoted, in turn, *United States v. Thornley,* 707 F.2d 622 (1st Cir.1983)). Certainly, the same evidence of Carrasco's purchase of a number of false documents for resale and his supplier(s)' necessary knowledge of the contemplated resale recounted above, reflects the supplier(s)' knowledge of the conspiracy's general aims. There is no logical reason why this evidence, which would clearly be applicable to demonstrate a knowing agreement to join a pre-existing conspiracy, also should not be applied to demonstrate the nature of the agreement required to establish a criminal conspiracy. In addition, because the central question in this matter is whether *either* party knowingly agreed to form or

join a conspiracy, a seller's sale to a buyer contemplating resale, when the seller is aware of the aim of the conspiracy to transfer, sell or barter false documents ("micas" and social security cards), is equally as probative of a conspiracy as a buyer's purchase with such awareness.

Carrasco's purchase of counterfeit alien registry and social security cards for resale to Herrera set forth in the taped conversations between Carrasco and Herrera and the transactions that took place pursuant to the plans recounted in the taped conversations, established the general aim of the conspiracy between Carrasco and his supplier(s) as the resale of false documents. The tape recorded meetings between Carrasco and Herrera involved arranging for false document purchases at a later date, supplying of data from Herrera to Carrasco, and actual false document purchases. The evidence that Carrasco's suppliers received payment from Carrasco for false documents that contained names identifying a person other than Carrasco further establishes that Carrasco's supplier(s), as well as Carrasco, were aware of this general aim. Thus, the evidence was sufficient for the trier of fact to conclude that Carrasco and his supplier(s) were knowingly and actively involved in a conspiracy to distribute false social security and alien registry cards prior to February 1987.

■ Diaz next contends that even if a conspiracy existed between Carrasco and his supplier(s) before the February 1987 time period in which the government alleges he joined the conspiracy, the evidence remained insufficient to support a finding that Diaz joined the conspiracy at that time. Diaz asserts that the record does not support findings either that he was the individual known as "Pancho," alleged to have been involved in the conspiracy or that he knowingly joined the conspiracy.

We have previously discussed the question of the evidence identifying Francisco Diaz as "Pancho" in the context of the admission of the taped voice recordings. As we noted, two witnesses, Agent Kading and Diaz' co-employee, Libia Ospina, direct-

ly identified Francisco Diaz' voice on tape recordings involved in this case.

This direct evidence identifying Diaz as "Pancho" was supplemented by circumstantial evidence. For example, Carrasco directed Herrera to leave telephone messages for "Pancho," whom he also called "Francisco," at a telephone number subscribed in the name of Diaz' brother, Jose, at the house where Francisco Diaz was arrested. The record further reflects that the calls Herrera made to "Pancho" were directed to this telephone number.[23]

The very timing and sequence of the transactions recounted in the record are also relevant to the identification of Diaz as "Pancho." On February 11 and 12, 1987, Herrera made calls in which he asked for and spoke with a person known as "Pancho." In a February 12 call, "Pancho" and Herrera agreed to a meeting that evening in which Herrera stated that he would obtain his "order." Within approximately ½ hour of the telephone call, Herrera went to the Noble street house where Diaz was arrested, met with "Pancho," and paid $60.00 for the false alien registry and the false social security cards. Thus, the recorded conversation with an individual responding to the name "Pancho" at the telephone number listed to Diaz' brother led to the delivery of the documents at the house where Diaz was apprehended.

A February 23, 1987, conversation between Herrera and Carrasco likewise was relevant to the identification of Francisco Diaz as the individual who sold the documents to Herrera on February 12. In the course of arranging a new false document transaction, Carrasco once again requested that Herrera telephone the same residence and ask for "Pancho" or "Francisco." Further, he stated that the persons living at that address were his brothers-in-law.[24] After Herrera stated that "Pancho" had delivered the documents to him on the previous occasion, Carrasco requested that Herrera describe this individual. After hearing this description, it can logically be inferred that Carrasco accepted the description as that of his brother-in-law Francisco Diaz, and felt confident leaving documents with another member of the conspiracy (Pancho), as he stated that he would again provide the false documents to Pancho.

Diaz' identification as "Pancho" was further confirmed in a later counterfeit document transaction. On March 2, Herrera spoke with a person identified as "Pancho" at Diaz' phone number and arranged to pick up the materials Carrasco was to leave for him at Pancho's residence. Approximately 45 minutes after this conversation, Herrera went to "Pancho's" house, where he met a woman who inquired whether he was there "about a social security," and upon his affirmative response, delivered the card to him for $20.00. Herrera asked the woman if "Pancho's" last name was Carrasco, and was told that it was "Diaz."

The evidence of timing and sequence of events outlined in the preceding three paragraphs established that Carrasco directed Herrera to speak with a person known as either "Pancho" or "Francisco," and that Herrera's telephone calls to "Pancho" were made to a phone number located at the house where Diaz was arrested. This series of events also demonstrates that Francisco Diaz' voice was directly identified by Agent Kading and Libia Ospina as that of "Pancho" on taped telephone conversations and that "Pancho's" February 12 document delivery to Herrera followed arrangements that had previously been made in phone calls placed to Diaz' number. The record further established that Carrasco impliedly agreed with Herrera's description of the "Pancho" who delivered the documents on February 12, and that the March 2 delivery, that took place after another call to Diaz' telephone number, included a statement of the woman delivering the documents that "Pancho's" last name was Diaz. All these facts, taken together, clearly provided a basis for a reasonable factfinder to conclude that Francisco Diaz was "Pancho."

**23.** In addition, testimony was presented that "Pancho" is a common nickname for the Spanish name "Francisco," Diaz' given name.

**24.** The record reflects that Carrasco and Francisco Diaz, in fact, were brothers-in-law.

Nonetheless, Diaz asserts that even if he could be identified as "Pancho," the evidence is insufficient to support a finding that he "knowingly" joined the conspiracy.

In determining whether Diaz knowingly joined the conspiracy, initially we note that Diaz was involved in repeated recorded telephone conversations with Herrera concerning the details of the delivery of false documents to Herrera. Secondly, during these telephone conversations Diaz referred to prior contacts he had with Carrasco concerning these transactions, from which a factfinder could very easily and properly infer communication between Carrasco and Diaz regarding the items Diaz was to deliver. Thirdly, a reasonable factfinder, relying on the evidence in the record, could not help but find that Diaz delivered a social security card and an alien registry card in return for money on February 12, 1987. Certainly, one knowingly participating in the personal delivery of fraudulent copies of government social security and alien registry cards in return for cash should and obviously would be placed on notice of the objective of the conspiracy. In addition, immediately following a recorded telephone call in which Diaz arranged for the delivery of a social security card to Herrera, Herrera went to see a woman who handed over the fraudulent social security card after asking if Herrera was there about a "social security." From these factual circumstances the trier of fact could reasonably infer that Diaz had informed the woman of the nature of and arranged for the delivery of the documents about to be exchanged for cash. We have previously observed that: "A conspiracy is an agreement; and to be a party to an agreement you must know something of its general scope and objective though not necessarily its details." *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985). Furthermore, as noted earlier in this decision, "[If] the facts indicate that the defendant must have known something ... then a [trier of fact] may be able to find beyond a reasonable doubt that he did know, espe-

cially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them." *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.1985)." *Cerro,* 775 F.2d at 911. When considering the totality of the evidence in the record, both direct and circumstantial, a reasonable factfinder could clearly conclude that Diaz knew the conspiracy's "general scope and objective," *Cerro,* 775 F.2d at 911, in that Diaz clearly knew of the general scope and objective of Carrasco's conspiracy to sell false alien registry and social security cards.

In sum, the evidence presented in this case contains facts sufficient to support inferences that a conspiracy existed between Carrasco and his supplier prior to February 1987, that Diaz was the individual Herrera knew as "Pancho," and that Diaz knowingly and willingly joined and participated in Carrasco's conspiracy. Based upon these facts a factfinder "exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt," *Nesbitt,* 852 F.2d at 1511, and have found that Diaz knowingly joined with Carrasco and his supplier in the conspiracy.[25]

## IV.

### ADMISSIBILITY OF EVIDENCE

Diaz asserts that the district court erred in admitting a number of evidentiary items.

Initially, Diaz contends that the co-conspirator hearsay exception does not support the trial court's admission of three tape recorded conversations. Two of the taped conversations took place between Carrasco and Herrera on February 5 and 23, 1987, respectively, and the other recorded conversation occurred between Herrera and the unidentified woman who delivered a social security card to Herrera on March 2, 1987. In order for statements to be

---

**25.** The same evidence of sales of false documents on February 12 and March 2, 1987, that helped form the basis of the conspiracy convic-

tion, are also sufficient to support the court's findings that Diaz improperly sold counterfeit alien registry and social security cards.

admitted as co-conspirator hearsay it must be "more probable than not that: 1) the declarant and the defendant were members of a conspiracy; 2) when the hearsay statement was made and 3) that the statement was in furtherance of the conspiracy." *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir.1989). Diaz' challenge rests on the first two of these criteria, as he alleges that a conspiracy did not exist on any of the dates these conversations took place. However, in Section III, *supra*, we determined that the evidence was sufficient for a trier of fact to conclude beyond a reasonable doubt that a conspiracy existed between Carrasco and the document manufacturer(s) prior to February 1987 and that Diaz knowingly joined this conspiracy in February 1987. Because a conspiracy did, in fact, exist at the time each of these statements were made, they were properly admissible as the product of hearsay of a co-conspirator.[26]

■ Diaz goes on to argue that the counterfeit social security card the unidentified woman delivered to Herrera at Diaz' residence on March 2 cannot be admitted into evidence. He contends that there was no proof that the woman was a member of the conspiracy, thus barring the utilization of the doctrine of vicarious liability as a basis for the document's admission. "A conspirator is liable for the acts of his coconspirators as long as he is a member of the conspiracy." *United States v. Andrus*, 775 F.2d 825, 850 (7th Cir.1985). We must determine whether the unidentified woman and Diaz were both part of the same conspiracy to distribute the false social security card to Herrera. We have determined in Section III of this opinion that the evidence was sufficient to support a holding that Diaz was a member of the conspiracy to distribute counterfeit alien registry and social security cards with Carrasco and his document supplier(s) at the time of the woman's delivery of the social security card to Herrera. The evidence in the record that the woman's delivery of the document to Herrera was the final phase of the conspiracy that began when Carrasco and Herrera agreed to the sale of a counterfeit social security card on February 23, 1987, and continued when Diaz agreed with Herrera on specific arrangements as to time and location of the delivery less than an hour prior to the woman's transaction with Herrera, supports a conclusion that this delivery was a component of the conspiratorial transaction. Moreover, the woman's inquiry as to whether Herrera was "here about a social security" and her receipt of money in exchange for the social security card demonstrates her knowing participation in a transaction that advanced the conspiracy's objective of sale and delivery of counterfeit documents. Accordingly, the trial court properly concluded that the woman was an active participant and, thus, a member of a conspiracy with Carrasco, document supplier(s) and Diaz at the time she delivered the false social security card to Herrera, thus permitting the introduction of the document against Diaz.[27]

■ Finally, Diaz asserts that the false alien registry and social security cards Diaz allegedly delivered to Herrera on February 12, 1987, should not have been received in evidence since Herrera failed to identify Diaz as the person who gave him the documents. As was discussed in Section III, *supra*, there is ample evidence in this record upon which a rational factfinder could have identified Francisco Diaz as "Pancho" and found that Diaz delivered these counterfeit documents to Herrera on February 12, 1987. Thus, the false alien registry and social security cards were properly admitted into evidence.

## V.

## ENTRAPMENT

Carrasco asserts that the district court erred in rejecting his entrapment defense.

We have recently observed that:

---

**26.** As our discussion in the following paragraph makes clear, the trial court could have properly concluded that the unidentified woman involved in the March 2, 1987, conversation was a member of the conspiracy.

**27.** There can be little question that this false social security card was relevant to the conspiracy issues, as it was documentary evidence of a transaction in counterfeit identification material, an overt act in furtherance of the conspiracy's aim of distributing false documents.

"The basic law governing the affirmative defense of entrapment is well established. In *Matthews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court noted that it had 'consistently adhered to the view ... that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct.' 108 S.Ct. at 886."

*United States v. Fusko,* 869 F.2d 1048, 1051 (7th Cir.1989). We have also noted that each party bears a burden in litigation concerning this defense:

"For a defendant to raise the entrapment defense, he or she must, 'produce evidence of both the Government's *inducement* and his own lack of *predisposition.* Once a defendant accomplishes this, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed or that there was no Government inducement.' *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985) (emphasis added) (citing *United States v. Gunter,* 741 F.2d 151, 153 (7th Cir.1984). Both the inducement and predisposition inquiries require an examination of the facts."

*United States v. Hawkins,* 823 F.2d 1020, 1024 (7th Cir.1987).

"The Supreme Court has characterized the lack of criminal predisposition as 'the principal element in the defense of entrapment.'" *Fusko,* 869 F.2d at 1052 (quoting *United States v. Russell,* 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). "Predisposition 'refers to whether the defendant has a readiness or willingness to commit the offenses charged or whether the government "implant[ed] in the mind of an innocent person" the disposition to commit the offense.'" *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985) (quoting *United States v. Fields,* 689 F.2d 122, 124 (7th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982)). "In elaborating on this element, we have stated that 'a "predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense." *United States v. Gabriel,* 810 F.2d 627, 637 (7th Cir.1987) (citations omitted).'" *Fusko,* 869 F.2d at 1052 (quoting *Hawkins,* 823 F.2d at 1024–25). We have gone on to note that:

"Our cases have established that an examination of the following factors is important in determining whether a defendant was predisposed to commit the crime: (1) the character or reputation of the defendant; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. '[T]he most important element of the equation is whether the defendant was reluctant to commit the offense.'"

*Fusko,* 869 F.2d at 1052 (citations omitted) (quoting *United States v. Thoma,* 726 F.2d 1191, 1197 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984)). In addressing a similar claim that entrapment had been demonstrated as a matter of law, we observed that:

"When determining whether the government had met its burden in proving that the defendant was predisposed to commit the crime, we must view the evidence in the light most favorable to the government and will affirm if any rational trier of fact could have found the requisite predisposition beyond a reasonable doubt."

*Perez–Leon,* 757 F.2d at 871. "Entrapment is established as a matter of law 'only when the lack of predisposition is apparent from the uncontradicted evidence.'" *United States v. Navarro,* 737 F.2d 625, 635 (7th Cir.1984) (quoting *Thoma,* 726 F.2d at 1197).

In approaching the predisposition inquiry, we note that the government made the initial suggestion of criminal activity and there was no definite testimony that Carrasco profited from this activity. The evidence of Carrasco's character and/or reputation is inconclusive. Although Carrasco was not a professional criminal, he had previously made it known to acquaintances that he had the capability of obtaining counterfeit documentation.

In this case, it is especially clear that "[t]he fourth factor [reluctance to commit the offense overcome by government persuasion] is ... the most important in determining [Carrasco's] predisposition." *Fusko*, 869 F.2d at 1053. In approaching this factor, we have previously stated that:

> "A lack of predisposition is shown if the 'evidence demonstrates some degree of Government involvement in coaxing the defendant into committing the offense, and that defendant, for whatever reason, was initially reluctant to become involved....' [*Thoma*, 726 F.2d at 1197]. We must also remember that, in determining predisposition, the 'principal focus ... of necessity must be on the first transaction.' *United States v. Gunter*, 741 F.2d 151, 154 (7th Cir.1984)."

*Fusko*, 869 F.2d at 1053.

In this case the first transaction between Carrasco and Confidential Informant Herrera is particularly relevant to Carrasco's predisposition to commit the crimes with which he is charged. In this conversation Herrera told Carrasco of his need to obtain an alien registry card for a friend. The first question Carrasco had after hearing this statement was, "For when do you need it?" His (Carrasco's) response did not reflect a reluctance to become involved in a transaction, but rather an interest in determining the details of the proposed transaction. The parties then discussed the fact that the document manufacturer was cur-

rently absent from the country, but would return. Shortly thereafter Carrasco told Herrera to look elsewhere, but said "if you are not able to arrange anything, you come back and we will go see if he has returned." Carrasco's willingness to proceed with the transaction, if his supplier had been available was clearly manifested in his statement: "If he [the supplier] were here, well, with pleasure." Carrasco's clear willingness to proceed was further confirmed when he supplied Herrera with his telephone number for the purpose of pursuing a possible sale of these documents and when he quoted to Herrera the prices for both the alien registry and social security cards.[28]

The evidence, viewed in the light most favorable to the government, was clearly sufficient for a rational factfinder to conclude that Carrasco was ready, willing, able and certainly not reluctant to engage in these transactions. Much of Carrasco's attention is focussed on the nature of the government's inducement of these sales. Essentially, Carrasco argues that the government preyed upon his deep concern for the problems faced by unregistered immigrants who need work to support themselves. Although the government informant made reference to these concerns, the fact remains that Carrasco, in his contact with the government, did not reflect any real reluctance to engage in the sale of false documents that was overcome by these appeals. Accordingly, based upon all the relevant factors, and appropriately emphasizing the absence of any real reluctance on Carrasco's part to engage in the document sale transactions, a rational factfinder could and did properly find beyond a reasonable doubt that Carrasco was predisposed to conspire to sell and sell counterfeit alien registry and social security cards. Because the Government established the predisposition to commit the offenses, the

---

**28.** Carrasco's predisposition to sell false documents, reflected in the initial conversation, was confirmed in various ways. He displayed knowledge of the operation in later conversations with Herrera, including his suggestions to Herrera concerning how Herrera could save money if he bought a "mica" and social security card together. Further he suggested to Herrera that he could go into the business on a wholesale basis and make money from resale transactions and how he (Herrera) could profit from purchasing blank social security cards wholesale and making false social security cards himself.

district court properly rejected the entrapment defense.[29]

## VI.

## SUPPRESSION OF CARRASCO'S POST–ARREST STATEMENTS

Carrasco also alleged that the district court improperly adopted a magistrate's recommendation rejecting Carrasco's motion to suppress statements he made during a post-arrest interrogation. In an attempt to conjure up a new defense with neither legal nor logical support, Carrasco asserts that an additional sixth amendment warning should be given in arrests made after an indictment and that, in any event, the totality of the circumstances of the interrogation in this case requires a conclusion that Carrasco's sixth amendment right to counsel was not properly waived.

We have previously set forth the standards we apply in reviewing a denial of a motion to suppress evidence:

"A district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous. We will rely on the district court's findings of fact absent a showing of clear error. This standard applies to the district court's findings on the credibility of witnesses, findings that will not be reversed unless clearly erroneous. 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)."

*United States v. D'Antoni*, 856 F.2d 975, 978–79 (7th Cir.1988) (citations omitted).

The Magistrate's Report and Recommendation, that the court adopted (hereinafter referred to as Magistrate's Report and Recommendation), made a number of factual findings relevant to this matter. With respect to the circumstances of the arrest, the court found:

"The agents arrested defendant Concepcion Carrasco at his place of employment. [Agent] Kading speaks Spanish (although he makes some mistakes, as the Government expert testified) and spoke to Carrasco in Spanish on that day. Kading told Carrasco, in Spanish, that he was 'acusado' or charged with selling counterfeit immigration and social security documents. Following Carrasco's arrest, he was brought to Kading's office in the Dirksen federal building and orally given his rights under *Miranda v. Arizona*, 384 U.S. 435 [436] [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), in Spanish. Carrasco also signed a paper, in Spanish, that also stated his *Miranda* rights and his acknowledgement that he had received them. Carrasco then listened to a tape that apparently held incriminating information. Afterwards, he gave a statement. When Kading asked him if he would sign a written statement, Carrasco said he wanted to talk to his lawyer first. No further questioning took place after that."

Magistrate's Report and Recommendation, at 2. The magistrate rejected a number of Carrasco's arguments regarding the circumstances of his interrogation. With respect to Carrasco's argument that he was poorly educated and had difficulty understanding Kading's Spanish the court found:

"[Carrasco] admits watching Spanish television and listening to Spanish radio. At the jobs he held prior to six or seven years ago, he spoke Spanish and had Spanish supervisors. Neither the Span-

---

**29.** We need not determine whether improper government inducement, the other required element of the defense was present in this case. *See Perez–Leon,* 757 F.2d at 871–72 (Concluding that entrapment defense was properly rejected on the ground that "there was more than suffi-cient evidence to establish that the defendant was not entrapped but possessed the requisite predisposition to commit the crime," *id.* at 871, without necessity for inquiry into the question of government inducement).

ish interpreter brought in by the Government as an expert nor Carrasco's co-defendant, Diaz, had trouble understanding Kading.

Carrasco testified that he understood Kading well enough to hear him say that anything he said could be used against him. It is also clear that Carrasco understood the rights given him in Spanish by Kading well enough to request a lawyer prior to putting any statement in writing, Kading repeated his Spanish version of the Miranda rights waiver form in court and the Government expert testified that, while he made one or two errors in tense, it was basically correct."

Magistrate's Report and Recommendation at 3. With respect to Carrasco's argument that Kading did not tell him the crime he was charged with committing, the court found that "Agent Kading stated that he told Carrasco that he was charged with selling counterfeit immigration and social security documents and I believe Agent Kading's testimony in this regard." Magistrate's Report and Recommendation at 3. Concerning Carrasco's assertion that Kading failed to tell him that he was under indictment, the court found:

"Kading told [Carrasco], in Spanish, that he was accused of selling counterfeit immigration and social security papers. Carrasco has cited no authority in support of his argument that some word other than 'acusado' had to have been used to fully inform him of his rights. He was told he was under arrest and was charged with selling counterfeit documents and was given his *Miranda* warnings. That was sufficient."

Magistrate's Report and Recommendation at 4. In summary, the magistrate, in her Report and Recommendation, held:

"I conclude that Carrasco was told that he had a right to a lawyer, that he understood he had a right to a lawyer, and that he voluntarily and intentionally waived his right to counsel. He was also told that he was charged with selling false immigration and social security papers. Carrasco has been in the United States since 1972 or 1973. He is also familiar with our criminal justice system, having

been arrested and deported in 1973 (he returned shortly thereafter). He also speaks and understands some English, as is shown by the fact that on the day of his arrest his employer spoke to him in English and he responded in English. Carrasco had also retained a lawyer to help him with his own immigration problems. Carrasco is not unsophisticated. Under the totality of the circumstances, there was a valid waiver of Carrasco's Sixth Amendment right to counsel."

Magistrate's Report and Recommendation at 4–5.

In our decision in *Quadrini v. Clusen,* 864 F.2d 577, 585–87 (7th Cir.1989), we recently addressed the question of waiver of the right to counsel in the context of an interrogation occurring after charges had been filed. We observed that:

"The Supreme Court held in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), that absent a valid waiver, confessions elicited from an accused after the right to counsel has attached violate the sixth and fourteenth amendments if they were elicited outside the presence of counsel. This standard requires us to answer three questions: (1) whether the right to counsel had attached at the time of the confession; (2) if so, whether the accused executed a valid waiver of his right to counsel; and (3) absent a valid waiver, whether the police conduct violated the accused's right to counsel."

864 F.2d at 585. In this case, as in *Quadrini,* "we find it necessary to address only the first two questions, namely whether the sixth amendment right to counsel had attached and whether [Carrasco] validly waived that right." *Id.*

Turning to the question of whether the right to counsel had attached at the time of the interrogation, we have noted that: "It is well established that a person is entitled to the service of a lawyer 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, *indictment,* information or arraignment." *Id.*

(quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (emphasis added). Because a federal grand jury indictment had been issued against Carrasco at the time of his arrest and custodial interrogation, it is clear that the right to counsel had attached.

"Because we have determined that [Carrasco] had a right to have counsel present during his interrogation, we must now determine whether he intelligently, freely and voluntarily waived that right." *Quadrini,* 864 F.2d at 586. "As with a waiver under *Miranda,* the government must prove 'an intentional relinquishment of a known right or privilege.'" *Id.* (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

■■■ In arguing that he did not knowingly waive his right to counsel, Carrasco urges that, in cases of post-indictment interrogations, we should require a specific sixth amendment right to counsel warning in addition to the standard *Miranda* warnings. We rejected just this sort of argument in *Quadrini:*

"The petitioner argues extensively that the sixth amendment should impose a heavier burden on the state than that under *Miranda* to prove waiver of a defendant's right to counsel. He contends that this heavier burden 'may require greater explanation of the rights being relinquished and/or a more clearly expressed waiver than that mandated by *Miranda.*' In support of this argument the petitioner substantially relies on *United States v. Mohabir,* 624 F.2d 1140, 1151–53 (2nd Cir.1980), in which the Second Circuit imposed a requirement that before a valid waiver can be executed, a federal judicial officer must explain to the accused the significance of the sixth amendment right to counsel. The petitioner ignores the fact that this court has previously considered the *Mohabir* decision and held: 'We decline to impose a rigid test for determining when the accused validly has waived his sixth amendment right to counsel. Rather, whether the accused has waived his sixth amendment right depends on the individual cir-

cumstances of each case.' *Robinson v. Percy,* 738 F.2d 214, 222 (7th Cir.1984) (citing *United States v. Springer,* 460 F.2d 1344, 1350–52 (7th Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972))."

864 F.2d at 586. Similarly, the United States Supreme Court recently rejected this sort of additional warning requirement in *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 2396–97, 101 L.Ed.2d 261 (1988), holding:

"As a general matter ... an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment right, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."

(Citation and footnote omitted). Accordingly, we reject the argument that specific warnings, in addition to those required under *Miranda,* must be given in order for a waiver of sixth amendment rights to be valid.

Carrasco also argues that the district court erred in determining that "[u]nder the totality of the circumstances, there was a valid waiver of Carrasco's Sixth Amendment right to counsel." Magistrate's Report and Recommendation, at 5. The district court's decision was an application of the "totality of circumstances" approach to waiver set forth in our decisions in *Love v. Young,* 781 F.2d 1307, 1316–18 (7th Cir. 1986), and *Robinson v. Percy,* 738 F.2d 214, 222 (7th Cir.1984).

■■■ The district court's analysis initially was grounded upon its finding that Carrasco understood the warnings concerning right to counsel that Kading provided him. Carrasco urges that the evidence of his lack of education supports his position that he was not adequately informed of his right to counsel. In our opinion the evidence should be viewed as establishing that Carrasco sufficiently understood his rights, especially in light of the fact that he ultimately spoke out and asserted his right to counsel and terminated the interrogation.

Had he failed to understand the warnings, how could he have exercised this right? "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

■ Secondly, Carrasco argues that the factual circumstances do not support a knowing waiver because he was not informed of the crime with which he was ultimately charged. Based on the record, the district court chose to believe Agent Kading's testimony that he informed Carrasco of the charged crime and found that Carrasco was informed of the crime with which he was charged. As the Supreme Court has noted: "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512. Based on our review of the record we conclude that this factual determination based on a credibility determination, was not clearly erroneous.

■ Carrasco in a final shot argues against waiver on the ground that he was not informed that he had been indicted. In *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 2396–97 n. 5, 101 L.Ed.2d 261 (1988), the Supreme Court explicitly refused to make a determination concerning the legal significance of such a failure, stating:

"An exception to this [the failure of lower courts to specify what warnings beside *Miranda* warnings must be given] is the occasional suggestion that, in addition to the *Miranda* warnings, an accused should be informed that he has been indicted before a postindictment waiver is sought. Because, in this case, petitioner concedes that he was so informed, we do not address the question of whether or not an accused must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid. Nor do we even pass on the desirability of so informing the accused—a matter that can be reasonably debated."

(Citations omitted). In light of the totality of the factual circumstances involved in this case, including the thorough *Miranda* warnings set forth in the record, the use of the Spanish word "acusado" at his arrest and Carrasco's obvious ability to understand and comprehend the communications he received, we do not agree that the district court's finding that Carrasco had knowingly waived his sixth amendment right was clearly erroneous. As the magistrate noted, Carrasco was informed of the crime with which he was accused and of his *Miranda* rights, warnings that are normally sufficient for sixth amendment purposes. Moreover, Carrasco was informed that he was "acusado," a Spanish term that means accused, indicted or charged. After our review of this record and in light of all of the facts and circumstances set forth therein, the trial court properly held that Carrasco knew of his right to counsel and knowingly, willingly and intentionally relinquished this known right. Thus, the trial court's ruling that Carrasco waived his sixth amendment right to counsel in connection with the post-arrest interrogation was free of error and its ruling deciding to suppress the evidence obtained from this interrogation is upheld.

Upon review of the record we are convinced that the trial court rulings were proper and, thus, the convictions of Carrasco and Diaz are

Affirmed.